UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RAYMOND GROSS, an individual, and PAUL LUCKING, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> SECURITY ASSOCIATES INTERNATIONAL, INC., a Delaware corporation; CORDELL FUNDING, LLLP, a Florida limited liability company; SA SYSTEMS, LLC, a Delaware limited liability company; CASTLEROCK SECURITY, INC., a Delaware corporation; ROBIN RODRIGUEZ, an individual; JOHN C. HOWE, an individual; and GARY FROHMAN, an individual, <br><br> Defendants. | No. 09 CV 3095 <br> Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

**I. BACKGROUND**

Plaintiff employees allege the following counts against Defendant employer, asset purchasers, and individual investors: (1) breach of employment agreement; (2) violation of the Illinois Wage Payment and Collection Act; (3) fraud; (4) oppression; (5) alter ego; and (6) piercing the corporate veil.  Defendants Security Associates International Inc., SA Systems, LLC, John Howe and Gary Frohman now move to dismiss certain of the claims against them.  For the following reasons, Defendants' motion to dismiss is granted in part and denied in part.

**II. STANDARD OF REVIEW**

A Motion to Dismiss under Rule 12(b)(6) requires that I analyze the legal sufficiency of the complaint, and not the factual merits of the case. *Autry v. Northwest Premium Servs., Inc.*,

144 F.3d 1037, 1039 (7th Cir.1998). I must take all facts alleged in Plaintiffs' complaint as true and draw all reasonable inferences from those facts in favor of Plaintiffs. *Caldwell v. City of Elwood*, 959 F.2d 670, 671 (7th Cir.1992). Plaintiffs, for their part, must do more than solely recite the elements for a violation; they must plead with sufficient particularity so that their right to relief is more than a mere conjecture. *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs must plead their facts so that, when accepted as true, they show the plausibility of their claim for relief. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Plaintiffs must do more than plead facts that are "consistent with Defendants' liability" because that only shows the possibility, not the plausibility, of their entitlement to relief. *Id.* (internal quotations omitted).

## III. STATEMENT OF FACTS

On August 6, 2001, Plaintiffs Ray Gross ("Gross") and Paul Lucking ("Lucking") entered into an Employment Agreement with Defendant Security Associates International, Inc. ("SAI"), a provider of home security alarms. The agreement provides

> The Employer [SAI] shall require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Employer [SAI] expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Employer [SAI] would have been required to perform it if no such succession had taken place. As used in this Agreement, 'Employer' shall mean both the Employer as defined above and any such successor that assumes and agrees to perform this Agreement, by operation of law or otherwise.

On May 1, 2003, SAI entered into an Amended and Restated Deferred Compensation Agreement ("Deferred Compensation Agreement") with Gross and Lucking, which effectively decreased the amount of Earned Cash Incentive due under the Employment Agreement in order to free up additional operating funds for SAI. This agreement also provides that if "SAI shall fail

2

to perform any of the obligations under the Agreement, Guarantors will, on written demand, promptly perform such obligations and will pay to Recipients, to the extent provided under this Agreement, and all reasonable expenses and reasonable attorney's fees that may be incurred to enforce such obligations of SAI . . . ." Guarantors are defined as "all direct and indirect subsidiaries of SAI . . . and any additional subsidiaries of SAI that may from time to time become parties to this Amended Agreement."

On May 25, 2004, Gross and Lucking entered into a Subordination Agreement with SAI and Defendant Cordell Funding, LLLP ("Cordell") in its capacity as Agent for the Lender under the Senior Loan Documents. Plaintiffs allege that Cordell, managed by Defendant Robin Rodriguez ("Rodriguez"), was engaged by SAI in 2004 to raise $55 million for refinancing and capital for SAI. After raising only a fraction of this capital, Cordell made loans to SAI for additional capital, taking a senior secured interest in SAI's assets and stock. Under the Subordination Agreement, most of the monies owed to Gross and Lucking under the Deferred Compensation Agreement were subordinated "to the prior satisfaction in full of the Senior Notes . . . " According to Plaintiffs, Rodriguez "masterminded" the Subordination Agreement in order to ensure that SAI make loan repayments to him prior to making any payments to Gross and Lucking. Plaintiffs allege that in return for the loans made by Cordell, Cordell required Lucking and Gross to forego a portion of Earned Incentive Compensation owed them. According to Plaintiffs, they agreed to a waiver of certain of these funds, and accepted a promissory note from SAI for the remaining. Plaintiffs further allege that "Cordell and others continuously indicated that the amounts represented by the promissory notes would either be paid in the future or converted to equity in any new entity to which SAI's assets might in the future be transferred."

On June 30, 2005, Alarm Funding purchased from SAI consumer alarm contracts.

In late 2006/early 2007, Gross and Lucking were awarded bonuses of approximately $85,000 each to be paid in the first quarter of 2007. Both Plaintiffs agreed to defer the bonus.

In February 2006, in exchange for an additional $1 million loan by Cordell to SAI, Gross and Lucking entered into Service Agreements, which provided that in case of foreclosure, Gross and Lucking would provide transitional services as part of SAI's satisfaction of its obligations to Cordell. These services would be provided for up to 120 days following foreclosure, subject to extension, at contractually defined rates. Plaintiffs allege that in return for signing the agreements they "were promised that they would be paid a premium of 50% above their then base salary for any work performed during a defined time period following a foreclosure . . ."

On February 28, 2008, Cordell declared a default by SAI under the loan agreements, and subsequently took control of the company. As a result, Rodriguez became SAI's Chairman and Treasurer, Frohman became a director and Chief Operating Officer, and Howe became President as well as a director. Plaintiffs allege that from that point forward, Rodriguez, Frohman and Howe operated for the sole benefit of Cordell and themselves at the expense of SAI, its shareholders, creditors, and employees. Upon completion of a foreclosure sale, SAI's assets and revenue were transferred to SA Systems, LLC ("SAS"), the only member of which is Cordell. Gross and Lucking continued to provide services to SAI.

On July 18, 2008, SAS sold the SAI assets to COPS Monitoring, resulting in a large payout to Cordell, and minimal proceeds to SAI. As part of the deal, SAS and SAI entered into a transition services agreement under which SAI would provide transitional services and SAS would pay employee expenses and other benefits. After Alarm Funding filed suit against SAI,

4

Cordell and others, the parties entered into an Asset Purchase and Settlement Agreement along with CastleRock Security, Inc. ("CastleRock") in which SAS transferred its assets to CastleRock. Plaintiff alleges that "[p]ursuant to the terms of the transaction, SAI was to remain in business in order to provide licensed security monitoring services to customers of CastleRock[,]" as neither CastleRock nor SAS could provide such services themselves. Also as part of the agreement, after closing, CastleRock was to select the management group to operate the business, and this group could include one or more of the SAI executives.

On November 26, 2008, CastleRock, SAS and SAI entered into a Transition Services Agreement under which SAI was to "retain and make available the Employees to assist in performing Transition Services, and SAI will have the authority to make all employee-related decisions regarding the Employees, including hiring and firing of employees and using any temporary employees . . ." Plaintiffs allege that under this agreement, "CastleRock had the ability to control SAI's decision regarding hiring, firing and compensating Plaintiffs that is consistent with joint employer status." Plaintiffs further maintain that CastleRock's acceptance of the benefits of Plaintiffs' labors "are sufficient to create an employer-employee relationship regardless of any labels applied by CastleRock, SAS or SAI . . ."

Plaintiffs claim that from February 2008 until the sale of assets to CastleRock, Cordell and Rodriguez repeatedly assured Plaintiffs that SAI's contractual obligations to them would be fulfilled if they continued with SAI until completion of the sale. These representations, which Plaintiffs claim were false, were allegedly made for the purpose of inducing Plaintiffs to continue working for SAI, and in doing so, Plaintiffs relied on Rodriguez' assurances. In December 2008, Plaintiffs were advised that they would not be offered positions with CastleRock. Plaintiffs

claim that these discussions were followed by a company-wide announcement that Plaintiffs would be leaving their employ. SAI then revoked Plaintiffs' titles and reassigned all their subordinates to CastleRock management. However, Plaintiffs "continued to work for the benefit of CastleRock and CastleRock treated them as employees." A June 30, 2009 letter from CastleRock to COBRA National Service instructed COBRA to offer Gross and Lucking coverage effective July 1, 2009, upon their removal from CastleRock's health plan. Plaintiffs' insurance cards reflect CastleRock to be the employer and policyholder.

Plaintiffs further allege that after December 2008, they were given several assurances by the new SAI and CastleRock management that the companies would fulfill their contractual obligations to Plaintiffs. In December 2008, the President of SAI allegedly authorized payments by SAI to Plaintiffs of past due wages, but Rodriguez personally ordered that those payments not be made. Plaintiffs further allege that Rodriguez instructed that no payments of wages, bonuses or vacation time be made without his approval.

On April 3, 2009, payroll payments to Plaintiffs ceased, without notice. On April 10, 2009 Gross and Lucking made a written demand for payment, and this demand was repeated by Gross on May 7, 2009. On May 22, 2009 Plaintiffs filed suit against Defendants. Plaintiffs subsequently filed an amended complaint alleging the following counts: (1) breach of employment contract; (2) unpaid wages pursuant to the Illinois Wage Payment and Collection Act; (3) Fraud against Rodriguez and Cordell; (4) fraud and oppression against the Cordell Defendants; (5) alter ego; and (6) piercing the corporate veil. Plaintiffs each seek $1 million in damages plus attorneys' fees and costs. Defendants Security Associates International Inc., SA Systems, LLC, John Howe and Gary Frohman now move to dismiss certain of the claims against

them. For the following reasons, Defendants' motion to dismiss is granted in part and denied in part.

## III. DISCUSSION

**Count I - Breach of Contract**

Defendants SAS, Howe, and Frohman make several arguments in support of their motion to dismiss Count I. First, Defendants maintain they were not parties to the employment agreements at issue, and that only SAI is a party to the employment and related agreements. With regard to SAS, Plaintiffs counter that the 2008 Asset Purchase and Settlement Agreement between CastleRock, Alarm Funding, SAS and Cordell expressly warrants that "SAS has no employees other than the SAI Executives," the definition of which includes Plaintiffs by name. It is true that Plaintiffs are not a party to this Agreement, but that matters little here. More relevant to Plaintiffs' argument is the recital that reads:

> On July 7, 2008, Cordell conducted a foreclosure sale under the Uniform Commercial Code as adopted as the law in the State of New York then in effect (the "Foreclosure Sale"), of substantially all of SAI's assets, <u>other than</u> certain licenses used in connection with its business, <u>its employees</u>, its leased real and personal property to the extent transfer required third-party consent, and other assets the transfer of which are prohibited by law or without third-party consent.

(Emphasis added). This paragraph expressly states that Cordell sold nearly all of SAI's assets *except* its employees. Plaintiffs make no allegations that they were paid by SAS. They rely solely on the "employee" clause discussed *supra*. Defendants characterize this clause as an "awkward" characterization of the relationship between SAS and SAI, since SAS had no employees at the time and the services it received were being provided by SAI. But this is a question of interpretation, and the plain meaning of this clause suggests that SAI's executives

7

were in fact employees of SAS. The presence of the two seemingly conflicting clauses in the same agreement makes it ambiguous, thereby rendering interpretation of the agreement inappropriate at this stage. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003) ("A contract is ambiguous only if the language employed is susceptible of different constructions when read in its plain and ordinary meaning.") (quoting *Althoff Indust., Inc. v. Elgin Med. Ctr., Inc.*, 420 N.E.2d 800, 803 (1981)); *Rizzo v. Pierce & Assoc.*, 351 F.3d 791, 793 (7th Cir. 2003) ("Interpretation of an unambiguous contract is a question of law."). The contract claim against SAS cannot be dismissed on this basis.

Plaintiffs next counter that Defendants Cordell, Rodriguez, Howe and Frohman assumed liability under these agreements "orally and through their actions." Specifically, Plaintiffs allege the following conduct by Defendants: (1) Cordell and others repeatedly assured Plaintiffs that the promissory notes they accepted from SAI for the owed Earned Incentive Compensation would either be paid or converted to equity in any new entity to which SAI's assets might be transferred; (2) Plaintiffs were promised payment of 50% above their base salary for providing post-foreclosure transitional services; (3) Cordell and Rodriguez repeatedly represented to Plaintiffs that SAI's obligations under the agreements would be satisfied if Plaintiffs continued with SAI until sale of the company was completed. Plaintiffs further maintain that they "relied on these representations in entering into the Services Agreements and in continuing to provide valuable services to SAI, SAS, and later CastleRock and in foregoing other opportunities.

Plaintiffs do allege that Cordell "required" them to forego Earned Incentive Compensation owed to them, but they make no similar allegations with regard to the signing of the Subordination Agreement, which contains the following clause:

8

> In the event of any Default . . .no payment of the Subordinated Deferred
> Compensation Obligation shall be made by the Company and each Recipient
> agrees that it will not ask, demand, due for, take or receive . . . any payment . . .
> until the relevant Default has been cured or waived.

Plaintiffs do not allege that this agreement is ambiguous in any way, but seem to instead suggest that the statements by "Cordell and others" that promissory notes would either be paid or converted to equity somehow modified the terms of the Subordination Agreement. Even if this is true, it is not a basis to infer that the Plaintiffs were entering into an employment agreement with Cordell or that Cordell somehow assumed SAI's obligations with regard to the promissory notes. Similarly, none of the other representations alleged by Plaintiffs can be read to infer an assumption of SAI's obligations by Defendants.

In their response, Plaintiffs argue that the representations made with regard to the promissory notes, as well as those connected with payment for post-foreclosure transitional services and the satisfaction of SAI's obligations generally, are "oral promises" which should "be enforced as either contracts or fraudulent statements."[1] The first alternative seems to suggest that Defendants may be liable for the alleged misrepresentations under theories of either oral contract or promissory estoppel. "Included among the elements of an enforceable contract are: (1) offer and acceptance; (2) definite and certain terms; (3) consideration; and (4) performance of all required conditions." *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 864 N.E.2d 927, 937 (Ill. App. 2007). But Plaintiffs do not plead facts that support an oral contract claim. "Consideration" is defined as a bargained-for exchange, where the promisor receives some benefit or the promisee suffers a detriment. *Vassilkovska v. Woodfield Nissan, Inc.*, 830 N.E.2d

---

[1] Whether Plaintiffs' fraud claims can withstand Defendants' motion to dismiss is discussed *infra*.

619, 624 (Ill. App. 2005). The only possible consideration alleged here is Plaintiffs' continued services. But, "[t]he preexisting duty rule provides that where a party does what it is already legally obligated to do, there is no consideration because there is no detriment." *Gavery v. McMahon & Elliott*, 670 N.E.2d 822, 826 (Ill. App. 1996). Two of the three alleged promises cited by Plaintiffs promise simply the enforcement of two existing agreements – the promissory notes and the Services Agreements – and Plaintiffs allege no new consideration in exchange for these promises.

Promissory estoppel is an available theory in the absence of a contract. *Quake Const., Inc. v. American Airlines, Inc.*, 565 N.E.2d 990, 1004 (Ill. 1990). However, the promises and misrepresentations alleged all refer to the fulfillment of obligations pursuant to an existing contract. It is difficult to see how promissory estoppel would be available here.

Next, Plaintiffs maintain that Defendants may be liable for SAI's breach of contract since SAI's assets were transferred to SAS and then CastleRock, and Plaintiffs continued to provide services "under the same employment contract and services agreements based on oral promises by" individual Defendants. In other words, SAS assumed SAI's assets and individual Defendants somehow modified and/or extended Plaintiffs' existing employment contract by way of their oral promises. Plaintiffs rely on *Czapla v. Commerz Futures, LLC*, 114 F. Supp. 2d 715, 717 (N.D. Ill. 2000), where the plaintiff alleged that one week prior to the expiration of his employment agreement with his employer, he and employer "reached a mutual agreement" that the plaintiff would continue working under the terms of the agreement subject to termination by either party or the execution of a written agreement. The plaintiff then sued the employer's successor for breach of contract. The defendant moved to dismiss the claim on the ground that the plaintiff failed to allege how it was liable for the oral contract, *Id.* at 720. The court denied

the motion, holding that the plaintiff's allegations that the defendant succeeded employer's business and continued doing business with the plaintiff under the ongoing agreement were enough to state a claim against the defendant. *Id.* But the facts alleged in *Czapla* are distinguishable from those before me. In this case, neither SAS nor CastleRock are alleged to be successors to SAI. SAI defaulted on its loans and SAS, formed by Cordell, purchased SAI's assets in foreclosure. SAI continued to exist and provide licensed security monitoring services.

Finally, Plaintiffs allege that Defendants and SAI are "alter-egos of each other," and that Defendants are each jointly and severally liable for breaches of the agreements. These allegations are discussed in detail *infra*. Because Plaintiffs have adequately pled an alter ego theory of liability, Defendants' motion to dismiss this count is denied.

**Count II – Unpaid Wages Pursuant to the Illinois Wage Payment and Collection Act**

In Count II, Plaintiffs allege that they are entitled to compensation under the Illinois Wage Payment and Collection Act ("IWPA"). 850 Ill. Comp. Stat. 115/1 *et. seq*. In their complaint, Plaintiffs allege that CastleRock is liable as a joint or direct employer and Rodriguez is personally liable as he personally directed that the amounts owed Plaintiffs not be paid. Plaintiffs also claim that Rodriguez, Howe and Frohman are personally liable as directors and/or officers who knowingly permitted the Defendant entities to violate the Act.

Under the IWPA, all wages earned by an employee must be paid no later than thirteen days after the end of a bi-weekly pay period, and seven days after the end of a weekly pay period. 850 Ill. Comp. Stat. 115/4. Upon termination, employers are required to pay final compensation, no later than the following scheduled payday. *Id.* at 115/5. Final compensation includes wages, salaries, commissions, bonuses, vacation, holiday time, and any other compensation owed pursuant to an employment agreement. *Id.* at 115/2. Any corporate officer or

employee who knowingly permits the corporation to violate the act are liable as employers under the IWPCA. *Id.* at 115/13.

Defendants do not dispute that Plaintiffs are owed certain compensation by SAI, but rather move for dismissal of this claim as it is alleged against them on the ground that they were not joint employers of Plaintiffs. SAS also moves to dismiss on the basis that nowhere in the complaint is this count alleged against it.

In Illinois, "[t]he test for the existence of joint employers is whether two or more employers exert significant control over the same employees-where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment." *Andrews v. Kowa Printing Corp.*, 838 N.E.2d 894, 904 (Ill. 2005) (citation and quotations omitted). In determining whether employers are joint in nature, courts must consider the alleged joint employer's role in (1) hiring and firing; (2) promoting and demoting; (3) setting wages, hours and other conditions; (4) disciplining employees; and (5) supervising employees. *Id.*

SAS is not named in Count II, which incorporates by reference the allegations preceding it. In their complaint, Plaintiffs make only one allegation with regard to SAS's role in the business – "SAS agreed to pay" – in the form of reimbursement to SAI - "the employee expenses, and the Transition Services Agreement specifically referenced salary of all employee's employee benefits and any other employee related expenses, including bonus." Payment of employees is not one of the factors courts need consider in determining whether there is joint employment. However, courts can consider additional facts asserted in a response to a motion to dismiss "as long as they do not conflict with the complaint." *Bryant v. Gardner*, 545 F. Supp. 2d

791, 801 n.2 (N.D. Ill. 2008) (citing *Albiero v. Kankakee*, 122 F.3d 417, 419 (7th Cir.1997)). In their response, Plaintiffs do cite a provision of the same agreement which states:

> SAS shall cause SAI to pay all Employees through SAI's payroll at the same rate each such Employee was paid as of the Effective Date. SAI will agree not to change the salary or wages of any Employee, or pay a bonus to any Employee, during the Term, except according to plans in place before the Effective Date or as may be requested or approved by SAS.[2]

Because Plaintiffs allege that SAS had some control over setting employee wages, Defendants' motion to dismiss Count II as to SAS is denied.

Plaintiffs premise the individual liability of Frohman and Howe on the execution of the Subordination Agreement between Plaintiffs, Cordell, and SAI, as well as allegations that the Cordell Defendants operated SAI solely for their own benefit. Under title 56, section 300.640(c) of the Illinois Administrative Code, "An employer who subordinates the wage claims of employees to the claims of other creditors has wilfully refused to pay wages, in violation of the Act." Defendants argue that nowhere do Plaintiffs allege any facts in support of their assertion Howe or Frohman knowingly permitted violations of the WPCA. But under Rule 8, complaints need not match facts to the elements of the legal theory presented. *See Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) (contrasting common law pleading with pleading under Rule 8). Plaintiffs allege that SAI entered into the agreement with Plaintiffs and that Howe and Frohman were directors of SAI. These factual allegations allow for the

---

[2] Another provision of the same agreement also reads:

> SAI will have the authority to make all employee-related decisions regarding the Employees, including hiring and firing of employees and using any temporary employees...

This raises a question of fact which cannot be decided on a motion to dismiss.

reasonable inference that Howe and Frohman knew of the agreement, therefore knowingly permitting SAI to violate the Act. For this reason, Defendants' motion to dismiss Count II as to Defendants Howe and Frohman is denied.

**Counts III and IV – Fraud and Oppression**

Plaintiffs allege that the following statements, all variations of one another, constitute fraud: (1) "Cordell and others" repeatedly assured Plaintiffs at the time they agreed to waive certain compensation that the promissory notes they accepted from SAI for the owed Earned Incentive Compensation would either be paid or converted to equity in any new entity to which SAI's assets might be transferred; (2) From February 2008 until November 2008, Cordell and Rodriguez repeatedly represented to Plaintiffs that SAI's obligations under the agreements would be satisfied if Plaintiffs continued with SAI until sale of the company was completed; and (3) From February 2008 until November 2008, "Rodriguez and the other Cordell Defendants" repeatedly represented to Plaintiffs "that if they continued to provide services to SAI through the time that SAI was either sold or restructured, then all amounts due and owing to [Plaintiffs] would be satisfied either out of the proceeds of any sale or restructuring or by providing [Plaintiffs] with equity in any new entity to which SAI assets were transferred." Plaintiffs further allege that the Cordell Defendants, as majority shareholders of SAI, misused their positions to divert all of SAI's value to themselves, leaving Plaintiffs unpaid while fraudulently inducing them to provide services.

The statements that Plaintiffs allege to be fraud are all promises of future conduct. In Illinois, "promissory fraud, involving a false statement of intent regarding future conduct, is generally not actionable under Illinois law unless the plaintiff also proves the act was a part of a scheme to defraud." *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc. et al.*, 493 F.3d 841, 853 (7th

Cir. 2007). A scheme to defraud may be present where "a larger pattern of deceptions or enticements that reasonably induce reliance" are alleged. *Desnick v. Am. Broadcasting Cos., Inc. et al.,* 44 F.3d 1345, 1354 (7th Cir.1995). "The distinction between a mere promissory fraud and a scheme of promissory fraud is elusive, and has caused, to say the least, considerable uncertainty, as even the Illinois cases acknowledge." *Id.* Under Federal Rule of Civil Procedure 9(b), the circumstances of the alleged fraud must be pled with particularity. This includes "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Windy City Metal Fabricators & Supply, Inc. v. CIT Technical Financing Services, Inc.*, 536 F.3d 663, 668 (7th Cir. 2008), (quoting *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078 (7th Cir.1997)).

Defendants argue that Plaintiffs allegations fail to satisfy Rule 9(b) pleading standards with regard to statements allegedly made by "Cordell and others," and those made by "the Cordell Defendants," who, according to Plaintiffs, consist of SAS, Cordell, Rodriguez, Howe and Frohman. Defendants maintain that Plaintiffs fail to name the individual(s) acting on behalf of Cordell and SAS, as well as the "other" individuals with any specificity. But the allegations are clear that Plaintiffs' claims are against "Rodriguez and the other Cordell Defendants" - all of them - including SAS, Cordell, Howe and Frohman. Plaintiffs do identify general time periods, but fail to include the method by which the particular misrepresentations were made, a matter of which Plaintiffs would have knowledge. For this reason, Defendants' motion to dismiss Count III is granted.

As to Count IV, Defendants argue again that the allegations lack the requisite specificity to withstand a motion to dismiss. However, Count IV is styled as a claim for "fraud and

15

oppression." Plaintiffs do not appear to be alleging fraud by way of misstatements, but rather oppression of minority shareholders, in this case, Plaintiffs. Defendants argue that when a secured lender forecloses on a security interest upon a default by borrower, shareholders cannot claim oppression. However, it is not the acquisition of the security interest that Plaintiffs allege to be oppressive, but rather the operation of SAI by majority shareholders at the expense of the remaining shareholders. The means by which Defendants acquired their controlling interest in the company is irrelevant to the allegations of misuse of that control. Defendants' motion to dismiss Plaintiffs' oppression claim for a lack of specificity is denied.

**Counts V and VI - Alter Ego and Piercing the Corporate Veil**

In Count V, "Alter Ego," Plaintiffs allege that SAI was inadequately capitalized, failed to follow corporate formalities, and operated as a facade for Defendants' gain, in an attempt to insulate Defendants from any liability, causing injury to Plaintiffs. In sum, SAI is allegedly the alter ego of Defendants, and Plaintiffs invoke this doctrine as the basis for Defendants' joint and several liability. This count incorporates by reference the remainder of the complaint, including the preceding counts. Plaintiffs plead in Count VI, entitled "Piercing The Corporate Veil," that Defendant entities used their corporate forms "fraudulently and for improper purposes" causing injury to Plaintiffs. Also incorporated by reference are the preceding counts and allegations. Plaintiffs seek to pierce SAI's and SAS's corporate veils to hold remaining Defendants liable. Because SAI is a Delaware corporation, and SAS is a Delaware limited liability company, it appears that Delaware law governs these claims. *See* 805 Ill. Comp. Stat. § 180/45-1 ("the laws of the State . . .under which a foreign limited liability company is organized govern its organization and internal affairs and the liability of its managers, members, and their transferees."). The parties do not thoroughly brief the choice of law issue, but Defendants

16

maintain that under either state's laws, the outcome is the same.

Under both Illinois and Delaware law, a corporation is a legal entity which is "separate and distinct from its shareholders, directors and officers, and generally, from other corporations with which it may be affiliated[,]" and those parties are not liable for any of the corporation's debts and liabilities. *See Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565, 569 (7th Cir. 1985); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 378 (7th Cir.2008) (quoting *Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*,864 N.E.2d 927, 941 (Ill. App.2007)).; *see, e.g., Mobil Oil Corp. V. Linear Films, Inc.*, 718 F. Supp. 260, 270 (D. Del. 1989) ("Under ordinary circumstances, a parent corporation will not be held liable for the obligations of its subsidiary."). The alter ego theory allows court to disregard the corporate entity and "pierce the corporate veil" to hold liable any individuals or entities that use a corporation as an instrumentality. *Van Dorn Co.*, 753 F.2d at 570; *Mobil Oil Corp.*, 718 F. Supp. at 266. In order to determine whether separate legal entities should be regarded as alter egos, courts must consider several factors including: (1) whether the corporation was adequately capitalized; (2) whether it is solvent; (3) whether dividends were paid; (4) whether corporate formalities were observed; (5) whether assets were diverted away from the corporation to the detriment of its creditors; (6) whether the corporation was merely a facade for the controlling shareholders. *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F. Sup. 1076, 1085 (D. Del. 1990); *Fontana v. TLD Builders, Inc.*, 362 N.E. 2d 767, 778 (Ill. App. 2005). Both Illinois and Delaware law require some sort of fraud or injustice in order to pierce the corporate veil. *Van Dorn Co.*, 753 F.2d at 570; *Mobile Oil Corp*, 718 F. Supp, at 268.

Defendants argue that Plaintiffs have failed to adequately plead these counts, as they have failed to allege facts in support of any of the required factors, as well as any facts that would

17

support a finding of fraud or injustice. The parties agree that SAI defaulted on its obligations to Cordell, calling into question SAI's solvency. Plaintiffs claim that the Rodriguez, Howe and Frohman distributed to themselves proceeds from the sale to SAS leaving SAI undercapitalized, and that SAS was an undercapitalized instrumentality through which Cordell did business. Once SAS purchased SAI's assets, SAI was dependent on SAS to provide cash for operations, and SAI operated solely for the benefit of SAS. By alleging these facts, Plaintiffs do successfully plead that assets were being diverted from SAI to SAS, Howe and Frohman, and that SAI was merely a facade for SAS.

Assuming Plaintiffs have adequately pled a number of factors that support a finding that SAI was an alter ego of SAS, Plaintiffs must also allege an injustice that would warrant piercing the veil. But not every breach of contract or tort, although certainly a type of injustice, satisfies this requirement. *Mobil Oil Corp.*, 718 F. Supp. at 268. In order to survive a motion to dismiss, under both Illinois and Delaware law, Plaintiffs must allege an injustice perpetrated through use of the corporate form. *See Source One Global Partners, LLC v. KGK Synergize, Inc.*, No. 08 C 7403, 2009 WL 2192791, at *5 (N.D. Ill. July 21, 2009); *Mobil Oil Corp.*, 718 F. Supp. At 269. Defendants contend that Cordell, through SAS, acted consistently within its rights as a secured lender, and that SAI is in no way a sham corporation. But Plaintiffs do not allege the injustice to be the purchase of SAI's assets, but rather the breach of the agreements between Plaintiffs and SAI. Plaintiffs further contend that the purchase of SAI's assets by SAS left merely a shell consisting of SAI's liabilities, which would not be paid as a result of the diversion of profits to SAS. For these reasons, Defendants' motion to dismiss Count V and VI is denied.[3]

---

[3] In *Mobil*, 718 F. Supp. at 266, the court remarked that the phrase "alter ego theory" has often been used interchangeably with such expressions as "piercing the corporate veil," but noted

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is granted as to Count III, and denied as to Counts I, II, IV, V, and VI.

ENTER:

*[signature: James B. Zagel]*

James B. Zagel
United States District Judge

DATE: November 17, 2009

---

that "the contours" of the theories are the same. Illinois courts have characterized the alter ego doctrine as "an equitable remedy," and one theory under which the corporate veil may be pierced. *See, e.g., Conopco, Inc.*, 1999 WL 965554, at *3 - *4. Whether piercing the veil is itself the remedy for alter ego claims, or whether they are considered to be one in the same, there appears to be significant overlap between the two and it appears unlikely that they would be considered two separate claims, the way Plaintiffs have presented them. However, because the issue has not been briefed, I decline to dismiss *sua sponte* either count as redundant.